# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

—————————————

Nº 05-CV-5246 (JFB)

—————————————

SCOTTIE MORRISON,

Petitioner,

VERSUS

ROBERT ERCOLE,
SUPERINTENDENT,
GREENHAVEN C.F.,

Respondent.

—————————————

MEMORANDUM AND ORDER
August 15, 2007

—————————————

JOSEPH F. BIANCO, District Judge:

Scottie Morrison (hereinafter "Morrison" or "petitioner") petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, to vacate his conviction for five counts of first-degree robbery and one count of third-degree robbery. Morrison challenges his conviction on the following grounds: (1) he was denied effective assistance of trial counsel; (2) he was denied effective assistance of appellate counsel; (3) the court improperly denied his challenge for cause of a prospective juror; and (4) his sentence was unlawful, harsh, and excessive.

For the reasons set forth below, the petition is denied.

## I. BACKGROUND

### A. The Underlying Facts

The following facts are adduced from the instant petition and underlying record.

On March 25, 1998, at approximately 9:00 a.m. on Beldevere Street in Brooklyn, New York, Morrison approached Mary Ann Santiago ("Santiago") and Marilyn Rivera ("Rivera"), displayed what appeared to be a gun, and took their jewelry. (Trial Transcript (hereinafter "TT") at 1156, 1162, 1163, 1213.)

On March 28, 1998, at approximately 12:30 a.m. on Himrod Street in Brooklyn, New York, Morrison approached Jacqueline DeJesus ("DeJesus") and Melissa Sepulveda

("Sepulveda"), displayed what appeared to be a gun, threatened to shoot them, and took their jewelry. (*Id.* at 947, 952, 955, 957.)

On April 15, 1998, at approximately 11:30 a.m. on Covert Street in Brooklyn, New York, Morrison approached Naomi Gonzalez and Janice Rojas ("Rojas"), displayed what appeared to be a gun, threatened to kill them, and took jewelry and money from Rojas. (*Id.* at 1830, 1840, 1843, 1845.)

On April 15, 1998, at approximately 12:30 p.m. on St. Nicholas Avenue in Brooklyn, New York, Morrison approached Rebecca Vega and Jasmine Gonzalez ("Gonzalez"), displayed what appeared to be a gun, threatened to shoot them, and took Gonzalez's earrings. (*Id.* at 1388, 1391, 1400.)

On April 16, 1998, at approximately 3:40 p.m. on Grove Street in Brooklyn, New York, Morrison approached Anna Acevedo and Melanie Santiago, displayed what appeared to be a gun, and took their jewelry. (*Id.* at 1494, 1500, 1504, 1506-1508.)

### B. Pre-Trial and Trial Procedures

Following his arrest, Morrison was charged with seven counts of robbery in the first degree pursuant to N.Y. Penal Law §§ 160.15[4], eight counts of robbery in the third degree pursuant to N.Y. Penal Law § 160.05, and additional related counts.[1]

The Supreme Court of the State of New York, Kings County, held a pre-trial *Wade* hearing to determine whether the lineup identifications made by the complaining

witnesses were unduly suggestive and should therefore be suppressed. The hearing court determined that the lineups in which Morrison was placed were fair and denied his motion to suppress. (Hearing Transcript (hereinafter "HT") 51-52.)

Subsequently, Morrison was tried before a jury and convicted of five counts of first-degree robbery and one count of third-degree robbery. Morrison was acquitted of all counts relating to the March 25, 1998 incident involving Santiago and Rivera. The court sentenced Morrison as a second violent felony offender to two consecutive terms of imprisonment of fifteen years on two of the first-degree robbery counts and concurrent sentences of fifteen years on the remaining three first-degree robbery counts. (Sentencing Tr. at 16-17.) The court sentenced Morrison to a concurrent term of three and one-half to seven years on the third-degree robbery count. (*Id.*)

### C. State Appeals and Post Judgment Motions

Morrison appealed his conviction to the Appellate Division, Second Department, raising three claims: (1) he was deprived of the effective assistance of counsel at trial; (2) the court erred in denying his challenge for cause of Juror Astarita; and (3) his sentence was unlawful, harsh, and excessive.

On November 26, 2001, the Appellate Division, Second Department, affirmed Morrison's judgment of conviction, holding that he had received effective assistance of counsel, the sentence imposed was not excessive, and that the court had properly imposed consecutive sentences where the crimes committed were based on separate and distinct act. *People v. Morrison*, 733 N.Y.S.2d 881 (N.Y. App. Div. 2001). Leave to appeal was denied by the Court of Appeals on March

---

[1] Counts relating to a February 19, 1998 robbery were severed from the instant indictment upon the People's motion because the detective involved in the investigation was unable to testify at trial.

26, 2002. *People v. Morrison*, 769 N.E.2d 365 (N.Y. 2002). Morrison's judgment of conviction was deemed final on June 24, 2002, ninety days after the New York Court of Appeals denied his leave application.

On May 15, 2002, Morrison sought new counsel and retained the Freedom Forum of New York City (hereinafter "Freedom Forum"), a unit of Furman Law Firm. On October 9, 2002, Sara Goldman (hereinafter "Goldman"), *pro bono* counsel with the Freedom Forum filed (on behalf of Morrison) an application for a writ of error *coram nobis* in the Appellate Division, alleging that his appellate counsel was ineffective. On December 2, 2002, the Appellate Division held that Morrison's assertion was unsupported, and denied his application for a writ of error *coram nobis*. *People v. Morrison*, 751 N.Y.S.2d 744 (N.Y. App. Div. 2002). Morrison did not appeal the Appellate Division's decision.

On May 13, 2003, Morrison received a letter from Goldman after he called the Freedom Forum stating that he had not received correspondence regarding the outcome of his application for a writ of error *coram nobis*. (Petitioner's Exhibit (hereinafter "Pet.'s Ex.") E.) Goldman's letter stated that the outcome of Morrison's application had been sent to him on December 9, 2002, but was returned to her office on January 7, 2003. (*Id.*)

In Goldman's letter to Morrison, she explained that her correspondence was returned because he refused to pick up his "legal mail." (*Id.*) In conclusion, Goldman's letter stated, "I am currently drafting a 2254 for submission to federal court in your case. I expect to have it complete in a few weeks. I will send you a copy at that time for review and comment before I file it." (*Id.*)

On June 3, 2003, Freedom Forum received Morrison's annual renewal fee. (Pet.'s Ex. C.) As per the Freedom Forum's "Member Renewal Payment Receipt," it was required to "exhaust all state and federal [remedies] that in the opinion of general counsel is appropriate." (*Id.*) Morrison, however, did not receive any correspondence from the Freedom Forum until Daniel Furman ("Furman"), the sole proprietor of Furman Law Firm, sent petitioner a letter dated September 20, 2003. (Pet.'s Ex. F.) Furman's letter advised petitioner that his 2254 petition was being reviewed and that Goldman was no longer his counsel due to an illness. (*Id.*) Furman apologized for the delay and stated, "rest assured you are first in our thoughts as to completing the 2254." (*Id.*) Pursuant to 28 U.S.C. § 2244(d), however, as explained *infra*, Morrison's petition for a federal writ of habeas corpus should have been filed by August 16, 2003.[2]

In a letter dated February 22, 2004, Morrison expressed his displeasure with the lack of correspondence he had received from the Freedom Forum. (Pet.'s Ex. G.) Morrison's letter referenced another letter he had written to the Freedom Forum, dated December 30, 2003, inquiring about the status of his petition for a writ of habeas corpus. (*Id.*) Petitioner claims that the Freedom Forum never responded to the February 22, 2004 correspondence. (Pet. Aff. at ¶ 12.)

Morrison also claims to have spoken to a "Mr. Levine" of the Freedom Forum shortly after he received Mr. Furman's letter dated September 20, 2003. Morrison stated that

---

[2] Pursuant to the provisions of 28 U.S.C. § 2244(d)(1), a petition for a writ of habeas corpus may be filed within one year from the date on which a conviction became final or from the time that the facts giving rise to petitioner's claim could have been discovered.

Levine assured him that his case was being pursued. Morrison requested all documents pertaining to his case so that he could pursue his own defense. (Pet.'s Ex. G.)

Morrison did not receive a written response from the Freedom Forum regarding the aforementioned inquiry. He did, however, receive a letter dated August 23, 2004, from Mr. Alireza Dilmaghani ("Dilmaghani"), a staff attorney for Furman Law Firm, who was now acting in the capacity of a probate attorney for the Freedom Forum. (Pet.'s Ex. H.) The letter advised petitioner that he would no longer be represented by the Freedom Forum because Furman had passed away and the firm had ceased to exist. (*Id.*) Dilmaghani's letter explained that Morrison's documents would be sent to him. (*Id.*)

Subsequently, Morrison sent a letter, dated November 7, 2004, to the New York Police Department Legal Bureau requesting documents pursuant to the New York State Freedom of Information Act. (Pet.'s Ex. I.) Additionally, on December 27, 2004, Morrison requested minutes from the New York Supreme Court, Kings County Appeals Bureau. (Pet.'s Ex. J.) On May 26, 2005, petitioner requested information regarding his petition for a writ of habeas corpus from the New York Supreme Court's Criminal Term Clerk's Office. (Pet.'s Ex. K.) In response to Morrison's inquiry, the Criminal Term Clerk's Office informed him that no writ of habeas corpus was filed by the Freedom Forum on his behalf. (*Id.*) By letter dated June 10, 2005, the *Pro Se* Writ Clerk also informed Morrison that no habeas corpus petition had been submitted on his behalf in 2003 and provided petitioner with instructions to file a petition for a writ of habeas corpus himself. (Pet.'s Ex. L.)

## D. The Instant Action

On October 31, 2005, Morrison filed a *pro se* petition for a writ of habeas corpus, raising the same claims that he had raised on his direct appeal and in his state court application for a writ of error *coram nobis*.

On December 5, 2005, the Honorable David G. Trager issued an Order to Show Cause that asked respondent to submit a return to the petition. Judge Trager also granted petitioner leave to proceed *in forma pauperis*. On February 2, 2006, the case was reassigned to the undersigned.

An opposition was filed on February 16, 2006, arguing that petitioner's writ of habeas corpus was time-barred pursuant to 28 U.S.C. § 2244(d) and thus should be dismissed. Petitioner's *pro se* reply was filed on March 3, 2006.

In an order dated July 24, 2006, this Court directed respondent to file an opposition brief addressing the merits of Morrison's petition. Respondent did so on September 15, 2006. Petitioner's's *pro se* reply was filed on October 10, 2006.

## II. DISCUSSION

### A. Statute of Limitations

Respondents seek to dismiss the instant habeas corpus petition because petitioner failed to file it within the applicable statute of limitations provided by § 28 U.S.C. § 2244(d)(1). In response, Morrison contends that his attorney's neglect in filing his writ of habeas corpus was so egregious that it amounted to an "extraordinary circumstance" that should warrant equitable tolling of the Antiterrorism and Effective Death Penalty Act's ("AEDPA") statute of limitations.

For the reasons set forth below, this Court holds that Morrison's petition is untimely under 28 U.S.C. § 2244(d)(1) and that equitable tolling is unwarranted because petitioner did not exercise reasonable diligence when confronted with the extraordinary circumstances involving his lawyer's failure to file his petition.

Pursuant to 28 U.S.C. § 2244(d)(1), there is a one-year statute of limitations on habeas corpus petitions that are filed by persons in state custody. Specific to the instant case, the period of limitations began running on the date that the judgment of conviction became final, which is either the conclusion of direct review, or the expiration of time for seeking direct review. 28 U.S.C. § 2244(d)(1)(A); *Bennett v. Artuz*, 199 F.3d 116, 118 (2d Cir. 1999), *aff'd*, 531 U.S. 4 (2000). For purposes of the AEDPA, Morrison's state convictions were deemed final ninety days after the New York Court of Appeals denied petitioner's leave application. *See Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001); *Pratt v. Greiner*, 306 F.3d 1190, 1195 (2d Cir. 2002). Thus, petitioner's judgment of conviction became final on June 24, 2002. On October 9, 2002, petitioner filed a motion for a writ of error *coram nobis* claiming that his appellate counsel was ineffective. Pursuant to the AEDPA, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation." 28 U.S.C. § 2244(d)(2). The Second Circuit has ruled that a state court application or motion for collateral relief is "pending from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures." *Bennett v. Artuz*, 199 F.3d at 120; *see also Carey v. Saffold*, 536 U.S. 214, 217, 220-221 (2002); *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000); *Gant v. Goord*, 430 F. Supp. 2d 135,

137 (W.D.N.Y. 2006). Accordingly, from October 9, 2002 when petitioner filed his post-judgment motion until December 2, 2002, when the Appellate Division denied it, the statute of limitations was tolled. In light of this tolling period, petitioner's time to seek a writ of habeas corpus expired on August 16, 2003. Therefore, because petitioner did not file his petition until October 31, 2005, his petition is untimely.

### 1. Equitable Tolling

The Second Circuit has adopted the rule articulated by a majority of circuits, characterizing the AEDPA's one-year period to file a writ of habeas corpus as a statute of limitations rather than a jurisdictional bar, thus enabling courts to equitably toll that period. *Smith*, 208 F.3d at 17; *accord Calderone v. U.S. Dist. Court (Kelly)*, 163 F.3d 530, 541 (9th Cir. 1999) (*en banc*); *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1999); *Miller v. N.J. State Dep't of Corr.*, 145 F.3d 616, 618 (3d Cir. 1998); *Miller v. Marr*, 141 F.3d 976, 978 (10th Cir. 1998). Equitable tolling, however, is only applied in "rare and exceptional circumstances" and should be awarded after consideration of all the facts and circumstances. *See Smith*, 208 F.3d at 17 (quoting *Turner v. Johnson*, 177 F.3d 390, 391-92 (5th Cir. 1999)); *Baldayaque v. United States*, 338 F.3d 145, 150 (2d Cir. 2003) (quoting *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 965 (2d Cir. 1981)).

To equitably toll AEDPA's statute of limitations, petitioner bears the burden of showing affirmatively that equitable tolling is warranted. *See Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 37 (2d Cir. 2002). Petitioner must demonstrate (1) that extraordinary circumstances prevented the timely filing of a petition for a writ of habeas corpus; and (2) that he acted with reasonable diligence during the period he seeks to toll. *Smith*, 208 F.3d at

17; *see also Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996) (noting that this circuit has equitably tolled the statute of limitations where extraordinary circumstances prevented a plaintiff from exercising his rights) (citations omitted); *see also Hizbullahankhamon v. Walker*, 255 F.3d 65, 75 (2d Cir. 2001).

For petitioner to show that extraordinary circumstances prevented the timely filing of his petition, he must demonstrate "a causal relationship between the extraordinary circumstances on which his claim for equitable tolling rests and the lateness of his filing . . . [This] demonstration cannot be made if petitioner, acting with reasonable diligence, could have filed on time irrespective of extraordinary circumstances." *Baldayaque*, 338 F.3d at 150 (citing *Hizbullahankhamon*, 255 F.3d at 75 (2d Cir. 2001). Thus, "if petitioner did not exercise reasonable diligence after the extraordinary circumstances began, the nexus between the extraordinary circumstances and his failure to file a habeas petition is broken. In such a situation, the alleged extraordinary circumstances cannot be considered the hindrance that caused petitioner's untimely filing." *Baldayaque*, 338 F.3d at 150 (citing *Hizbullahankhamon*, 255 F.3d at 75 (2d Cir. 2001).

a. "Extraordinary Circumstances"

The Second Circuit has consistently held that mere attorney mistake does not rise to the level of an extraordinary circumstance that is sufficient to equitably toll AEDPA's statute of limitations. *Smaldone v. Senkowski*, 273 F.3d 133 (2d Cir. 2001); *see also Geraci v. Senowski*, 211 F.3d 6, 9 (2d Cir. 2000) (holding that attorney's miscalculation of time remaining to file a petition did not constitute an extraordinary circumstance that would justify equitable tolling of AEDPA's limitations period); *accord Fahy v. Horn*, 240 F.3d 239, 244 (3d Cir. 2001) (holding that attorney

errors, such as inadequate research, are considered ordinary mistakes that do not warrant equitable tolling); *Taliani v. Chrans*, 189 F.3d 597, 598 (7th Cir. 1999) ("[A] lawyer's mistake is not a valid basis for equitable tolling."); *Sandvik v. United States*, 177 F.3d 1269, 1270 (11th Cir. 1999) ("[M]ere attorney negligence . . . is not a basis for equitable tolling.").

Untimely petitions that involve attorney malfeasance, however, should not be considered automatically barred from equitable relief. *Baldayaque*, 338 F.3d at 151. The Second Circuit has distinguished ordinary mistakes made by attorneys from attorney conduct so egregious that it prevented petitioners from filing timely petitions. *Baldayaque*, 338 F.3d at 152 ("It is not inconsistent to say that attorney error *normally* will not constitute the extraordinary circumstances required to toll the AEDPA limitations period while acknowledging that at some point, an attorney's behavior may be so outrageous or so incompetent as to render it extraordinary.").

In a strikingly similar case also involving the Freedom Forum's failure to file a timely habeas petition, *Burgos-Santos v. Greene*, No. 05 Civ. 3736 (PKC), 2005 WL 2452920, at *3 (S.D.N.Y. Oct. 5, 2005), the court held that petitioner's attorney's conduct rose to the level of extraordinary circumstances because of the confluence of the following: "the acceptance of payment for the benefit of petitioner, the ambiguous and hence, misleading communications from the 'Freedom Forum,' the cavalier transfer of a client (*i.e.* petitioner) from [one attorney] to [another attorney] without any indication that either secured the client's prior informed consent, the inaction of [the first attorney] and Mr. Furman in not filing a habeas petition within the limitations period,

and the failure of either to inform petitioner of their failure to act."[3] *Id.*

There are many factual similarities between the *Burgos-Santos* case and this case. The Freedom Forum accepted Morrison's member renewal payment and agreed to "exhaust all state and federal [remedies] that in the opinion of general counsel [were] appropriate." (Pet.'s Ex. C.) As in *Burgos-Santos*, there was a transfer of Morrison's case from Goldman to Furman, accompanied by a promise to complete the habeas petition. (Pet.'s Ex. F.) Furman and Goldman not only failed to file the habeas petition within the limitations period, but also failed to inform Morrison of their lack of action. In fact, they told him otherwise, indicating in multiple correspondences that they were working on the petition. (Pet.'s Exs. E. and F.) Morrison's belief that his petition was indeed being timely filed was reasonable and grounded in his communications with counsel. Under these circumstances, based upon petitioner's affidavit and accompanying documentation of his communications with the Freedom Forum, the Court finds that this course of events constituted extraordinary circumstances satisfying the first required prong for equitable tolling.[4]

### b. "Reasonable Diligence"

However, although Morrison has satisfied the "extraordinary circumstances" prong for equitable tolling, this alone is not enough to justify equitable tolling of the AEDPA's limitations period. To equitably toll the limitations period, petitioner must also show that he acted with reasonable diligence, and that but for extraordinary circumstances, his petition would have been timely. *See Hizbyullahankhamon*, 255 F.3d at 75. The degree of diligence required to satisfy this standard "is not extreme diligence or exceptional diligence, it is *reasonable* diligence." *Baldayaque*, 338 F.3d at 153. Petitioner's diligence should be evaluated in light of the facts surrounding his particular situation. *Id.* The Second Circuit has provided guidance by distinguishing the "reasonable diligence" inquiry from the "extraordinary circumstances" inquiry, which involves situations that are beyond a petitioner's control. *Id.* at 151.

In the attorney incompetence context, reasonable diligence cannot be achieved simply by retaining an attorney. *Burgos-Santos*, 2005 WL 2452920, at *3. Petitioner must also "demonstrate that he himself made reasonably diligent attempts to ensure that his petition was filed on time." *Id.*

In the instant case, Morrison did not act with reasonable diligence. While Morrison was advised of his attorney's death and of the dissolution of the Freedom Forum on August 23, 2004, he did not seek to learn from the Court whether or not a petition had been filed on his behalf until May 31, 2005. Morrison then waited until October 31, 2005, more than a year after receiving the letter notifying him of the death of his attorney, to file the instant petition. Morrison has made no showing that he made any effort during this period to inquire into the status of his petition. This delay demonstrates a lack of reasonable diligence on Morrison's part. *See Jiminez v. Phillips*, No. 04 Civ. 10155 (RWS), 2006 U.S. Dist. LEXIS 1124, at *10 (S.D.N.Y. Jan. 16, 2006) (holding that petitioner failed to exercise reasonable diligence where petitioner made no showing of effort to file petition during five-month period

---

[3] As in the instant case, the attorneys in *Burgos-Santos* were also Goldman and Furman.

[4] In assessing these circumstances, this Court takes into consideration the fact that Freedom Forum's behavior was not unique to Morrison's situation but had in fact occurred previously with Burgos-Santos.

between the date of last communication with attorney and date upon which he received notice of his attorney's unexpected death).

Morrison claims that his delay occurred because he did not receive paperwork from his attorney. However, it is clear that a reasonably diligent petitioner would have filed the petition earlier, with or without the documents, and informed the court of the attorney's actions frustrating the filing of the petition. *See Dawson v. Phillips*, No. 04-CV-1355 (NG), 2005 U.S. Dist. LEXIS 38440, at *12 (E.D.N.Y. Dec. 20, 2005); *Jones v. Fischer*, 03 Civ. 8313 (AJP), 2004 U.S. Dist. LEXIS 25495, *5-*6 (S.D.N.Y. Dec. 21, 2004) (holding that reasonable diligence was not shown where petitioner waited fifteen months after he learned his attorney did not file his habeas petition before filing the petition himself) (and collecting cases). Additionally, Morrison's petition, eventually filed on October 31, 2005, merely included the points raised by him in his direct appeal, which as part of his ineffective assistance of counsel claim he claims to have written himself. Therefore, his attorney's subsequent paperwork would have been irrelevant to him. *See e.g.*, *Doe v. Menefee*, 391 F.3d 147, 175 (2d Cir. 2004) ("In the attorney incompetence context . . . the reasonable diligence inquiry focuses on the purpose for which the petitioner retained the lawyer, his ability to evaluate the lawyer's performance, his financial and logistical ability to consult other lawyers or obtain new representation, and his ability to comprehend legal materials and file the petition on his own.").

Because Morrison did not exercise reasonable diligence after the extraordinary circumstances occurred, the nexus between the extraordinary circumstances and his failure to file a habeas petition is broken. *See Hizbullahankhamon*, 255 F.3d at 75. Therefore, Morrison's petition is time-barred

under 28 U.S.C. § 2244(d)(1). Accordingly, Morrison's petition may be denied on untimeliness grounds alone. However, in an abundance of caution, the Court turns to the merits of the instant petition. For the reasons that follow, even assuming *arguendo* that petitioner was entitled to equitable tolling, the instant petition fails on the merits.

B. The Standard of Review

To determine whether a petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review provided in 28 U.S.C. § 2254, as amended by the AEDPA, Pub.L. No 104-132, 110 Stat. 1214, which provides, in relevant part:

(d) An application for a writ of *habeas corpus* on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254. "Clearly established Federal law" is comprised of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

AEDPA establishes a deferential standard of review – "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). While "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Gilchrist*, 260 F.3d at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

For the reasons that follow, even assuming *arguendo* that the instant petition is not time barred, the petition must be denied on the merits.

## C. Ineffective Assistance of Trial Counsel Claim

Morrison contends that he received ineffective assistance of trial counsel. Specifically, he argues that: counsel was ineffective because (1) trial counsel failed to move to re-open the *Wade* hearing; (2) counsel failed to object to the admission of a diagram of the area where the crimes occurred; and (3) counsel failed to move for dismissal on the ground that the prosecution had failed to prove that defendant "displayed what appeared to be a handgun." (Pet. at 2; *see also* State Appellate Div. Br. at 33.) For the reasons stated below, this Court finds that Morrison's trial counsel was not constitutionally ineffective.

Under the standard promulgated in *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984), a petitioner is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

The first prong requires a showing that counsel's performance was deficient. However, constitutionally effective counsel embraces a "wide range of professionally competent assistance," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of trial counsel's actions under all circumstances, keeping in mind that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Greiner*, 417 F.3d at 319 (quoting *Rompilla v. Beard*, 545 U.S. 374, 389 (2005)).

The second prong focuses on prejudice to the petitioner. The petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. In this context, "reasonable probability" means that

the errors were of a magnitude such that it "undermines confidence in the outcome." *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). "[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695).

Thus, the petitioner is required to show both that trial counsel was ineffective and that there is a reasonable probability that the specific alleged errors by counsel affected the ultimate outcome of the trial. This Court proceeds to examine each prong in turn, keeping in mind that a habeas petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004). As set forth below, Morrison's claim fails to satisfy either element.

### 1. Deficient Performance Inquiry

Morrison first argues that his trial counsel was deficient because he failed to move to reopen the *Wade* hearing in order to challenge the fairness of the lineup identifications. At the pre-trial hearing, Detective William Ryan testified that he put all of the victims together in a room and left them unattended for an hour while he put together the lineup. (HT, October, 20, 1998 at 100, 102-103.) The complainants testified at the trial that they were left together in a room at the precinct for an hour and that they talked amongst themselves, discussing their cases with other individuals who had come to view the lineup. (TT, Vega: 1371-1372, 1378-79; J. Gonzalez: 1415-18, 1456, 1458-59; Acevedo: 1520-1521, 1569-1572; Santiago: 1623-26; N. Gonzalez: 1684, 1711-12; Rojas: 1858, 1862, 1887-89.)

"The purpose of a *Wade* hearing is to determine [before] the trial whether pretrial identification procedures have been so improperly suggestive as to taint an in-court identification." *Twitty v. Smith,* 614 F.2d 325, 333 (2d Cir. 1979) (citing *U.S. v. Wade,* 388 U.S. at 242). Under N.Y. Crim. Proc. Law § 710.40(4), the trial court has discretion to reopen a *Wade* hearing if "additional pertinent facts" are discovered that could not have been discovered with reasonable diligence before the *Wade* determination. These facts must go "to the issue of the official suggestiveness such that they would materially affect or have affected the earlier *Wade* determination." *Lynn v. Bliden*, 443 F.3d 238 (2d Cir. 2006) (quoting *People v. Clark*, 670 N.E.2d 980, 981 (N.Y. 1996)).

Here, no additional pertinent facts were revealed at trial to undermine the hearing court's decision that the lineup identifications were not unduly suggestive. Prior to rendering its decision on the admissibility of the lineups, the hearing court was aware that the complainants had been placed unattended together in a room before viewing the lineup. (HT, October, 20, 1998 at 100, 102-103.) Thus, it cannot be said that it was objectively unreasonable for Morrison's counsel to decline to move to reopen the *Wade* hearing on that basis.

Second, Morrison argues that his trial attorney was deficient for failing to object to the admission of a diagram of the neighborhood where the crimes occurred. (Pet. at 6.) Each complainant was asked to mark the place on the diagram where the crime had taken place. (Resp. Ex. B (Pet. State Br.) at 32.) According to Morrison, this allowed the jury to commingle the evidence from each incident and implicitly suggested to the jury that the separate incidents were connected. (*Id.*)

However, when the diagram was introduced, the jury had already heard that the robberies had occurred within blocks of each other. (TT at 926.) Moreover, the trial court clearly instructed the jury to consider each verdict separately. (*Id*. at 2075.) Therefore, admission of the diagram was not improper and trial counsel's failure to object to the admission of the neighborhood diagram linking the incidents did not indicate a deficient performance.[5]

Last, Morrison argues that counsel failed to move to dismiss on the ground that the prosecution failed to prove that defendant "displayed what appeared to be a handgun." (Resp. Ex. B (Pet. State Br.) at 33.) Under N.Y. Penal Law § 160.15[4], a person is guilty of first-degree robbery when he forcibly steals property and "displays what appears to be a . . . firearm."

In considering the sufficiency of the evidence, the Court "must look to state law to determine the elements of the crime." *Carter v. Grenier*, No. 02-CV-2797 (JG), 2004 WL 733422, at *4 (E.D.N.Y. April 6, 2004). Under New York State law, the element of display

required for first-degree robbery is satisfied when the evidence establishes that the defendant consciously displayed something that could reasonably be perceived as a firearm, with the intent of taking property, and the victim actually perceived the display. *People v. Washington*, 646 N.Y.S.2d 39, 39 (N.Y. App. Div. 1996). At trial, numerous witnesses testified that Morrison had his hand in his pocket, pointed towards them, and that they believed he had a concealed gun. (TT at 955, 1050, 1504, 1610, 1671.) According to the testimony, petitioner also threatened to shoot them, furthering their perception that Morrison was brandishing a firearm. (*Id*. at 955, 1051, 1504, 1673.) Sufficient evidence therefore existed to meet the display requirement for first-degree robbery under N.Y. Penal Law § 160.15[4], and therefore, Morrison's trial counsel was not deficient in performance by declining to move for dismissal on such grounds where there would have been no merit to the motion.

In sum, although Morrison faults his trial lawyer's failure to raise certain arguments, these arguments lack merit, and the performance of trial counsel was not deficient by failing to raise them. Accordingly, habeas relief on such ground is denied.

## 2. Prejudice Inquiry

Although Morrison's failure to show deficient performance disposes of his ineffective assistance claim, the Court also finds that even assuming *arguendo* trial counsel's performance was deficient, any alleged deficiencies in his trial counsel's performance did not result in prejudice to petitioner's case. "In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the 'cumulative weight of error' in order to determine whether the prejudice 'reache[s] the constitutional threshold.'" *Sommerville v. Conway*, 281 F. Supp. 2d 515, 519 (E.D.N.Y.

---

[5] Because the admissibility of evidence in state courts is a matter of state law, evidentiary questions are not subject to federal review under 28 U.S.C. § 2254 unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right. *United States ex rel. DiGiacomo v. Franzen*, 680 F.2d 515 (7th Cir. 1982) (citing *U. S. ex rel. Clark v. Fike*, 538 F.2d 750 (7th Cir. 1976) (holding that habeas petitioner's constitutional rights were not violated when state's witness was allowed to testify as to mathematical likelihood of hairs, which were found in car, belonging to petitioner)). Accordingly, to the extent Morrison also separately argues the admission of the diagram is grounds for habeas releif, the Court finds that argument without merit because Morrison was not deprived of a fundamentally fair trial or a constitutional right by admission of the diagram.

2003) (quoting *Lindstadt v. Keane*, 239 F. 3d 191, 202 (2d. Cir. 2001)). The defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

As described above, trial counsel's performance was not deficient. In fact, counsel successfully obtained an acquittal on all counts relating to one robbery incident involving two victims. Because, as stated *supra*, there would have been no merit to a motion to reopen the *Wade* hearing or a motion to dismiss for failure to prove an element of the crime, it cannot be said that Morrison was prejudiced by his trial counsel's performance. With respect to introduction of the neighborhood diagram, even if it had been deemed inadmissible upon an objection from defense counsel, as stated above, the jury had already heard that the robberies occurred within blocks of each other, and therefore the admission of the diagram did not create any prejudice against Morrison. Moreover, the jury acquitted Morrison of one of the robberies, indicating that they were in fact able to examine each incident separately and not commingle them into one. Accordingly, it cannot be said that, but for any alleged errors, the outcome of the trial would have been different. Thus, the Court finds that there was no prejudice caused by trial counsel's actions. Therefore, Morrison's claim as to trial counsel's ineffectiveness fails to meet the two-prong standard as required by *Strickland* and is thus without merit.

### D. Ineffective Assistance of Appellate Counsel Claim

Morrison argues that his appellate counsel was ineffective because she merely used Morrison's research, sticking a cover on it and submitting it as a brief. (Pet. at 10.) A criminal defendant has the right to the effective assistance of counsel on the direct appeal of his conviction. *See Evitts v. Lucey,* 469 U.S. 387,

395-96 (1985). In determining whether appellate counsel has rendered constitutionally effective assistance, courts will apply the same standard established in *Strickland*, 466 U.S. at 687-96, for analyzing such claims as to trial counsel. *See,* e.g., *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citing *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992)). Thus, under the *Strickland* standard, a petitioner alleging ineffective assistance of appellate counsel must prove both (1) that appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and (2) that, absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful. *See Mayo*, 13 F.3d at 533-34; *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001). Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259 (2000) (citing *Jones v. Barnes*, 463 U.S. 745, 750-54 (1983)).

Appellate counsel's brief, submitted to the Appellate Division, Second Department, is properly structured and contains a table of contents, questions presented, and a lengthy statement of facts of both the hearing and trial with appropriate citations to the record. In the brief, the legal issues presented relate the law to the facts of this case, and appellate counsel made sound legal arguments. The appellate brief presents a sharp contrast to Morrison's submissions to this Court which are considerably less organized, contain a multitude of spelling mistakes and grammatical errors and have little structure to the legal arguments. Given these distinctions in the filings, it is not entirely credible that appellate counsel merely slapped a cover on Morrison's research and submitted it as her brief to the Appellate Division on Morrison's behalf.

However, more importantly, Morrison fails to identify any claim that appellate counsel

failed to raise. Thus, under the standard set forth in *Strickland*, Morrison cannot show that appellate counsel's failure to raise a claim was objectively unreasonable or that, if raised, there was a reasonable probability that his appeal would have been successful. *Strickland,* 466 U.S. at 691-693. Appellate counsel raised a number of claims, and as stated above, presented them in a well-researched and well-written format in the appellate brief. Morrison fails to demonstrate any claim that would have had a reasonable probability of success had it been raised by his appellate counsel. Accordingly, the Court finds that petitioner's claims as to appellate counsel's ineffectiveness are without merit.

### E. Jury Selection

Morrison argues that the trial court committed an error by not granting his for-cause challenge against prospective juror Annette Astarita ("Astarita"), thereby violating his Sixth Amendment right to an impartial jury. (Pet. at 7.) During *voir dire*, Astarita stated in the abstract that sympathy for a victim "might" affect the way she listens to a case.[6]

---

[6] The *voir dire* dialogue between defense counsel and Astarita was as follows:

> Defense Counsel: It is natural that you feel something for [the people that were robbed]. Would everybody feel something for somebody who has been the victim of a crime? Ms. Astarita?
> Prospective Juror: Some sympathy, sure.
> Defense counsel: I really think that it would be unnatural not to. That's not the issue, that is not the issue, whether or not you will feel sympathy. The question really is, is the sympathy going to be so much that it might affect the way you listen to the case and the way you listen to the evidence? And basically, Miss Joseph, I am asking that, do you think the sympathy [for the robbery victims] will be so much that it might affect the way you listen to the case?

The Sixth Amendment to the United States Constitution provides, in relevant part, that criminal defendants "shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI § 2. "The right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). A criminal defendant challenging the impartiality of his jury panel has the burden of proving prejudice. In other words, "the petitioner must show the 'actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Knapp v. Leonardo*, 46 F.3d 170, 176 (2d Cir. 1995) (quoting *Irvin*, 366 U.S. 723) (internal quotations omitted). A habeas court sitting in review of a state trial court's finding of impartiality may overturn it only upon a finding of "manifest error." *Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (citing *Irvin*, 366 U.S. at 723). This question of "whether jurors have opinions that disqualify them is one of historical fact to which the habeas presumption of correctness applies," and "a federal court sitting in habeas review is not permitted to redetermine the state trial court's factual findings regarding the credibility of jurors whose demeanor has been observed by the trial court – and not the habeas court." *Garrido-Valdez v. Poole*, 384 F. Supp. 2d 591, 597 (W.D.N.Y. 2005); *see Patton*, 467 U.S. at 1038 (explaining that the statutory presumption of correctness is applied to trial court findings of impartiality because the determination is largely a question of demeanor and is made after an extended voir

---

> Prospective Juror Joseph: No, it won't.
> Defense Counsel: Ms. Astarita, how about you?
> [Astarita]: I don't know.
> Defense Counsel: You think it might?
> [Astarita]: Might.

(TT at 784-785.)

dire proceeding designed specifically to identify juror prejudice); *see also Rushen v. Spain*, 464 U.S. 114, 120 (1983). Ultimately, a habeas court must determine "whether there is fair support in the record for the state trial court's conclusion that the jurors here would be impartial." *Patton*, 467 U.S. at 1038.

In the instant case, the trial court's decision to keep Astarita on the jury was not an abuse of discretion, nor was it a manifest error by the trial court. It was within the trial court's discretion to assess Astarita's tone and demeanor, and a habeas court is required to apply a presumption of correctness to the trial court's decision. *Patton*, 467 U.S. at 1036, 1038. This Court was not present to witness Astarita's disposition during *voir dire*, and in analyzing the trial transcript, a mere single-worded answer of "might" in response to a question of sympathy towards a victim is not sufficient to indicate prejudice. Astarita was asked a number of other questions, and her answers demonstrated her impartiality and ability to appropriately apply the law.[7]

Astarita's use of the ambiguous word "might" in response to a question regarding sympathy for victims, taken in the context of the totality of her responses to the court and counsel, does not demonstrate a state of mind that would preclude her from rendering an impartial verdict. Upon initial questioning during *voir dire*, Astarita specifically stated that she "didn't know" if sympathy would effect her decision. (TT. at 784.) By observing the juror's demeanor during this question and the other questions, the trial court had the opportunity to evaluate whether a substantial risk existed that Astarita was biased and determined that she was, in fact, qualified to sit as a juror. *See e.g.*, *Knapp*, 46 F.3d at 176; *Patton*, 467 U.S. at 1036 (holding that ambiguity in testimony of three jurors was insufficient to overcome presumption of

_____

allegations or whatever. It is your job to defend him.
[Defense Counsel]: In doing that, do you think that we have to prove him innocent before you can vote note guilty?
[Astarita]: No.

(TT. 777-78.)

All of the prospective jurors, including Astarita, were asked the following:

Court: Can all of you accept the fact that a – any defendant accused of any crime, even murder, is presumed to be innocent when the case begins? All of you can accept that? Anybody got any question about it?

(TT. at 734.)

Defense Counsel: As you look at [Morrison] now, is there any reason you think you would not be able to be a good juror on this case?

(TT. at 769.) There was no indication from Astarita that she could not give Morrison a fair trial, be a fair juror, or presume Morrison innocent when the case began, in response to these questions.

_____

[7]  Among the questions asked during voir dire, Astarita was specifically asked the following:

Prosecutor: Can you promise me that you can evaluate all the evidence and keep an open mind and listen to other people as well when you go in there if you are chosen to deliberate, can you do that, Ms. Astarita?
[Astarita]: Yes.

(TT. at 754-755.)

* * *

Court: Ms. Astarita, if you – before you vote not guilty, if that were to happen, would you require us to prove him innocent of the charges?
[Astarita]: No.
Court: Why not?
[Astarita]: Because you are supposed to be defending him against the prosecution's

correctness owed to trial court's findings that the jurors would be impartial).

Furthermore, by merely pointing to Astarita's single-worded ambiguous answer of "might," Morrison has not met his burden of proving actual prejudice. That is, although it may have been preferable for the court to follow-up on the jurors's ambiguous answer regarding whether sympathy might affect the way she listens to the case, the Court does not view that failure as constituting manifest error when considered in light of the entire *voir dire.* Accordingly, the state court decisions denying petitioner's impartial juror claim were not contrary to, nor an unreasonable application of, clearly established federal law and this claim does not warrant habeas relief.

## F. Excessive Sentence[8]

Finally, Morrison claims that his sentence of two consecutive terms of imprisonment of fifteen years for two counts of first-degree robbery is unlawful, harsh, and excessive.[9] As

---

[8] On June 22, 2007, petitioner moved to hold in abeyance his petition to this Court pending a motion filed in the New York State Supreme Court, Kings County, to set aside his sentence pursuant to N.Y. Crim. Proc. Law § 440.20. Relying on a recent decision by the New York Court of Appeals, *People v. Rosas*, 868 N.E.2d 199, 836 (N.Y. 2007), petitioner claimed that there was a change in the law regarding the imposition of consecutive sentences and a clarification of the term "separate act" contained in N.Y. Penal Law § 70.25. By letter dated July 18, 2007, respondent objected to petitioner's request and argued that there was no change in New York law regarding consecutive senences. Specifically, in *Rosas*, the Court held that consecutive sentences were improper where defendant was convicted of two counts of first degree murder for causing the death of two victims, with the intent to cause the death or serious physical injury of the second victim, because the *actus reus* was the same for both offenses. *Rosas*, 868 N.E.2d at 202. In particular, the court held, specifically in addressing the first degree murder statute, that "neither offense exist[ed] independently of the other as both offenses were committed through a single *actus reus.*" *Id.* Accordingly, *Rosas* does not represent a change in law and is factually distinguishable from the instant case where each count of first degree robbery was a separate and independent act. Thus, because this Court agreed with respondent that petitioner's claim that there had been a change in the law was without merit, the Court denied the request to hold the petition in abeyance. Petitioner's claim regarding the imposition of consecutive sentences is discussed *infra*.

[9] The trial court gave Morrison a determinate sentence of fifteen years on each of the five counts of first-degree robbery, and a lesser term for the one count of third-degree robbery involving Rojas. All counts were made to run concurrently except for the two counts of first-degree robbery arising from the incident on March 28, 1998, involving

set forth below, the Court finds this argument to be without merit.

Morrison contends that the thirty year sentence for the DeJesus-Sepulveda robbery is contrary to N.Y. Penal Law § 70.25(2), which addresses the legality of concurrent or consecutive prison sentences. Subsection (2) provides that "[w]hen more than one sentence of imprisonment is imposed on a person for two or more offenses committed through a single act or omission, or through an act or omission which in itself constituted one of the offenses and also was a material element of the other, the sentences . . . must run concurrently." *Id.* An "act" is defined as "a bodily movement." N.Y. Penal Law §15.00(1).

Morrison argues that the DeJesus-Sepulveda robbery was a "single act" as opposed to two acts because the elements of the robberies overlapped.[10] It is well-settled that an excessive sentence claim may not be raised as grounds for habeas corpus relief if the sentence is within the range prescribed by state law. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."); *see also Stallings v. Woods*, No. 04 CV 4714 (JG), 2006 WL 842380, at *22 (E.D.N.Y. Mar. 27, 2006) (denying excessive sentence claim on the

---

DeJesus and Sepulveda.

[10] According to petitioner, Sepulveda, told the Grand Jury that upon approaching DeJesus and demanding her property, Morrison declared that he had a gun and kept his left hand in his pocket, "messing around with it." (Resp. Ex. B (Pet. State Br.) at 40.) According to Morrison, there was no separate and distinct "bodily movement" of displaying the gun to Sepulveda since the display of the gun was a material element of the first crime against DeJesus, and therefore, under N.Y. Penal Law § 70.25(2), a concurrent sentence is required. (Pet. at 9.) The Court rejects this argument for the reasons set forth *infra*.

merits, despite petitioner's failure to exhaust it, where petitioner's sentence fell within the range prescribed by state law).

Morrison's sentence falls within the range prescribed by N.Y. Penal Law § 70.25(2) and is not unlawful. Under N.Y. Penal Law § 160.15[4], a person is guilty of first-degree robbery when he forcibly steals property and "displays what appears to be a . . . firearm." In two separate acts, Morrison took property from both DeJesus and Sepulveda, displaying what appeared to be a firearm to both of them. In fact, the elements of the two robberies did not overlap. Morrison first displayed what appeared to be a gun and took property forcibly from DeJesus before even turning to Sepulveda – thus, the elements for first-degree robbery were completed in Morrison's actions against DeJesus before he began to rob Sepulveda. The trial court has discretion to impose consecutive sentences where there are multiple convictions and the offenses represent separate and distinct acts. *See Ashby v. Senkowski*, 269 F. Supp. 2d 109, 115 (E.D.N.Y. 2003); *see also People v. Daniels*, 659 N.Y.S.2d 67, 68 (N.Y. App. Div. 1998) (holding the imposition of consecutive sentences for second-degree murder, first-degree robbery, and attempted first-degree robbery proper where defendant displayed a gun, demanded money from three victims, and then shot and killed one victim after ordering him out of a parked truck); *People v. Meehan,* 646 N.Y.S.2d 716, 718 (N.Y. App. Div. 1996) (holding consecutive sentences proper for robbery and depraved indifference murder convictions where there was "evidence that the serious physical injury necessary for the robbery conviction was caused by an act other than the homicidal act"); *People v. Hunt*, 572 N.Y.S.2d 139, 140 (N.Y. App. Div. 1991) (finding that intentional murder and burglary arose out of separate acts because burglary was complete when defendant entered the home with the intent to commit a larceny and "the murder was committed thereafter when the victim

unexpectedly returned home and defendant intentionally caused her death").

Consecutive sentences cannot be imposed where the *actus reus* is the same for both offenses.[11] *People v. Rosas*, 868 N.E.2d 199, 202 (N.Y. 2007). When both offenses are committed through a single *actus reus*, neither offense exists independently. *Id* at 497. In the instant case, Morrison had a separate actus reus for each robbery, and each offense therefore exists independently. In addition, "[c]onsecutive sentencing is permissible when the defendant's acts are 'distinguishable by culpable mental state, nature and manner of use, time, place and victim.'" *People v. Ramirez,* 677 N.E.2d 722, 727 (N.Y. 1996) (quoting *People v. Brown,* 604 N.E.2d 1353, 1356 (N.Y. 1992)). Morrison had two distinct goals, which he carried out in two distinct actions; he robbed Sepulveda by displaying what appeared to be a handgun *and* he robbed DeJesus by displaying what appeared to be a handgun. Accordingly, he had a distinguishable *actus reus* and *mens rea* in each action, clearly separating the two robberies.

Morrison's sentence therefore falls within the range prescribed by New York state law under § 70.25(2), requiring two separate acts for consecutive sentencing, and the Appellate Division correctly found that the imposed consecutive sentences were proper. *People v. Morrison*, 733 N.Y.S.2d 881 (N.Y. App. Div. 2001). In sum, the Court concludes that petitioner's sentence was not contrary to, nor an unreasonable application of, clearly established federal law.

___

[11] *Actus reus* is defined as "'[t]he wrongful deeds that comprises the physical components of a crime and that generally must be coupled with *mens rea* to establish criminal liability.'" *Rosas*, 868 N.E.2d at 201 n.2 (quoting Black's Law Dictionary 39 [8th edition 2004]).

III. CONCLUSION

Petitioner has demonstrated no basis for relief under 28 U.S.C. § 2254. Accordingly, the instant habeas petition is DENIED. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2).

The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 15, 2007
Central Islip, NY

* * *

The petitioner, Scottie Morrison, appears *pro se*. The attorney for the respondent is Charles, J. Hynes, King's County District Attorney, by Rhea A. Grob, Esq., Assistant District Attorney, District Attorney Kings County, 350 Jay Street, Brooklyn, New York 11201.